**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ERIC WASHINGTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 13 C 7436** |
| | ) | |
| **TAKE CARE HEALTH SERVICES, LLC,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Eric Washington, an African-American male, works as a nurse practitioner. From 2010 until 2012 he was employed by Defendant Take Care Health Services, LLC, a company that provides primary care health services within Walgreens stores. In late 2011, Washington trained for a position as Clinic Coordinator at a Walgreens in Lockport, Illinois, but he struggled with the responsibilities of that position, drawing complaints from subordinates and a verbal and written warning from supervisors. After being cautioned that failure to improve would result in termination, Washington filed a formal complaint of race and sex discrimination and then, ten days later, resigned. In this lawsuit, he alleges that he was subjected to a hostile work environment and constructively discharged as a result of harassment, discriminated against on the basis of race and sex, and retaliated against for complaining about the alleged discrimination. Washington moves for summary judgment [33] on his race and sex discrimination claims, as well as his retaliation claim. Defendant moves for summary judgment on all counts [30]. Plaintiff's allegations do not establish a hostile working environment, nor has he presented evidence that he suffered an adverse employment action, that he was meeting his employer's legitimate expectations, or that his employer had any discriminatory intent. Defendant's motion for summary judgment is granted and Plaintiff's motion is denied.

## BACKGROUND

Eric Washington is an African-American male trained and licensed as a nurse practitioner. (Pl.'s Stmt. of Material Facts [34], hereinafter "P. SOF," ¶ 1.) He began working for Defendant Take Care Health Services ("TCH") with the title Nurse Practitioner in February 2010 at the Orland Park, Illinois location. (P. SOF ¶ 4.) TCH operates health care clinics within select Walgreen Co. ("Walgreens") store locations. (Def.'s Stmt. of Material Facts [32], hereinafter "D. SOF," ¶ 3.) Each clinic is managed by one Clinic Coordinator and is staffed by at least one Nurse Practitioner, one or more Medical Concierges, and one or more Medical Assistants. (D. SOF ¶ 4.) The Clinic Coordinator reports to a Market Manager who oversees all clinics within a designated market. (D. SOF ¶ 4.) The Market Manager, in turn, reports to a Regional Vice President. (D. SOF ¶ 4.) Finally, each TCH Clinic works with a Collaborating Physician who oversees treatment decisions in the clinic. (D. SOF ¶ 53; Pl.'s Resp. to Def.'s Stmt. of Material Facts [39], hereinafter "P. Resp. to D. SOF," ¶ 53.)

While working at the Orland Park clinic, Plaintiff had a disagreement with his Clinic Coordinator, Teresa Jones, regarding his scheduling. (D. SOF ¶ 5; P. Resp. to D. SOF ¶ 5.) He e-mailed the centralized Human Resources mailbox, "HR Solutions," stating that "there is unfairness at Orland Park and I would like a transfer." (D. SOF ¶ 6; P. Resp. to D. SOF ¶ 6.) In November 2010, Mary Scoigletti, the Chicago Southwest Market Manager, announced a vacancy for a full-time Nurse Practitioner at TCH's Joliet, Illinois location; Plaintiff applied for the position and was transferred in early 2011. (D. SOF ¶ 7; P. Resp. to D. SOF ¶ 7.) Washington's commute to the Joliet clinic was 50–60 minutes each way, and Washington was formally disciplined for repeated tardiness, a problem he attributes to difficulties resulting from the long commute. (D. SOF ¶ 8; P. Resp. to D. SOF ¶ 8.) After being disciplined for tardiness in August 2011, Washington explained to Scoigletti that he was eager to transfer to a clinic closer to his home in Gary, Indiana. (D. SOF ¶ 8; P. Resp. to D. SOF ¶ 8.) The same month, Plaintiff received a call from an individual in TCH corporate headquarters, unidentified in the

record, who advised him that two Clinic Coordinator positions were available, one in Lockport, Illinois, another in Orland Park. The Clinic Coordinator position was a promotion for Plaintiff, and both openings were closer to his home. (P. SOF ¶ 5.) The TCH official offered Washington his choice of the two locations, and he initially asked to be appointed to the position in Orland Park. (P. SOF ¶ 5.) A few days later, however, Washington learned that the position had already been filled by another TCH employee, a woman named Ruth; the Lockport location was still available, however, and Washington accepted it. (P. SOF ¶¶ 5–6.) A few days later, Washington received yet another call, this time from Audrey Collins, the acting Market Manager for the South Market, where the Lockport clinic is located. (P. SOF ¶ 7.) Though Plaintiff had already accepted the Lockport position, Ms. Collins asked him to relinquish it. (P. SOF ¶¶ 6–7.) She explained that Dolphine Coleman had been serving as the Acting Clinic Coordinator while the prior Coordinator was on maternity leave, but had been deprived of the chance to bid for permanent appointment to the job because she was on vacation when the position was posted internally. (D. SOF ¶¶ 10, 12; P. Resp. to D. SOF ¶ 10.) Washington declined to step aside, however, and was officially transferred to Lockport in September or October 2011. (P. SOF ¶ 8; D. SOF ¶ 14; P. Resp. to D. SOF ¶ 14.)

## I.      Washington's Transition to the Clinic Coordinator Role

There are two Clinic Coordinator ranks within TCH: CCI and CCII. The CCI is responsible for overseeing the operations of the clinic, seeing patients, ordering supplies, doing patient "callbacks," and communicating with the Walgreens Store Manager and Pharmacy Manager regarding clinic operations. (D. SOF ¶ 15; P. Resp. to D. SOF ¶ 15.) The CCII has all the responsibilities of the CCI but also exercises supervisory authority over the Medical Assistants and Medical Concierges. (D. SOF ¶ 15; P. Resp. to D. SOF ¶ 15.) TCH requires employees to complete a training course for each position before being officially promoted. (D. SOF ¶ 16; P. Resp. to SOF ¶ 16.)

Washington completed the CCI training and was given the job title of CCI on November

12, 2011. (D. SOF ¶ 18; P. Resp. to D. SOF ¶ 18.) He completed the CCII training in mid-December 2011 and his job title was accordingly changed to CCII by January 1, 2012. (P. Resp. to D. SOF ¶ 20; P. SOF ¶¶ 13, 18.) While Washington completed the training, Dolphine Coleman continued to serve as the Acting Clinic Coordinator. (D. SOF ¶ 17; P. Resp. to D. SOF ¶ 17.) According to Plaintiff, this caused "CC role confusion" and had a negative impact on morale at the clinic. (P. Resp. to D. SOF ¶ 19; P. SOF ¶ 14.) Washington notes that during his first day at Lockport (presumably in September or October 2011, before competing his training), Washington met the collaborating physician, Dr. Bruckner. (P. SOF ¶ 11.) When Washington introduced himself as the Clinic Coordinator, Dr. Bruckner responded that Dolphine Coleman was the Clinic Coordinator, and if there had been a change he would have been informed of it. (P. SOF ¶ 11.) Plaintiff also notes that, a few weeks after he transferred to Lockport, Dolphine Coleman introduced herself as the Clinic Coordinator at their first meeting. (P. SOF ¶ 12; Dep. of Eric Washington, Ex. A to D. SOF [32-1], hereinafter "Washington Dep.," 364:10–24.)

## II.    Complaints about Washington

It is undisputed that once Washington officially took over the Clinic Coordinator role in January 2012, TCH management began receiving complaints about Washington's performance. On January 2, 2012, Coleman—who stayed at Lockport in the Nurse Practitioner position— wrote an e-mail message to Washington, alerting him that certain tasks were being overlooked: callbacks to patients were not completed in a timely manner, and needed supplies had not been ordered. (D. SOF ¶ 21; P. Resp. to D. SOF ¶ 21; Decl. of Dolphine Coleman, Ex. G to D. SOF [32-1] ¶¶ 3–4.) Washington responded via e-mail, agreeing that the number of callbacks was "troublesome" but blaming the problem on the Medical Assistant, Katelyn Watt, who, according to Washington, was playing games on the computer, looking at Facebook, and reading novels during her shift. (D. SOF ¶ 22; P. Resp. to D. SOF ¶ 22; P. SOF ¶ 26.) Washington also raised his concerns about Watt to his direct supervisor, Anne Weigel, who had taken over from Collins

4

as the Market Manager of the South Market.  (P. SOF ¶ 26; D. Resp. to P. SOF ¶ 26.)

On January 4, 2012, the parent of a clinic patient complained that Washington had recorded her son's blood pressure on his chart without actually checking the patient's blood pressure.  (D. SOF ¶ 23; P. Resp. to D. SOF ¶ 23.)  On February 7, 2012, Megan Hernandez, the store manager at the Lockport Walgreens, wrote to Weigel listing concerns that she and her Walgreens staff had about Plaintiff's performance.  She noted patient complaints, including that the "[d]osing on prescriptions [was] incorrect"; that patients asked "who the nurse is on staff, if it is [Plaintiff] they come back to see Dolphine"; and that a specific employee, who visited the clinic as a patient, had complained that Plaintiff made her uncomfortable during the visit. (Hernandez E-mail Feb. 7, 2012, Ex. A to Decl. of Megan Hernandez, Ex. H to D. SOF [32-1], hereinafter "Hernandez E-mail"; D. SOF ¶ 24; P. Resp. to D. SOF ¶ 24.)  Hernandez also noted staff complaints, including a "[l]ack of basic supplies needed in the clinic"; that Plaintiff was improperly using the emergency call button, including "calling 911 for a patient and not notifying staff"; that he spoke to patients and staff with headphones on; and that there was a general "[l]ack of communication through out [sic] store, pharmacy and Dolphine."  (Hernandez E-mail.) On February 11, 2012, Weigel received a complaint from Watt, the Medical Assistant, complaining that Washington was not helping with patient callbacks.  (D. SOF ¶ 25; Watt E-mail Feb. 11, 2012, Ex. B to Decl. of Anne Weigel, Ex. F to D. SOF [32-1].)

Washington and Coleman also had a scheduling disagreement:  as Clinic Coordinator, Washington was responsible for designing the schedules for clinic employees.  In November 2011, shortly after Plaintiff transferred to Lockport, Coleman submitted a proposed schedule to Washington, dividing up Coleman and Washington's shifts, and requesting time off in March 2012, but Washington did not respond to her proposed schedule.  (D. SOF ¶ 27; P. Resp. to D. SOF ¶ 27.)  Coleman e-mailed Washington again on January 2, 2012 regarding her proposed schedule; Washington objected to her proposal because it required him to work four days in a row, and he responded with his own proposed schedule.  (D. SOF ¶¶ 21, 27, 44; P.

Resp. to D. SOF ¶¶ 21, 27, 44.) Coleman explained in an e-mail that Washington's proposal decreased her hours and required her to work two consecutive weekends. (D. SOF ¶ 27; P. Resp. to D. SOF ¶ 27.) When Washington remained unresponsive to Coleman's concerns, she reached out to Weigel. Weigel attempted unsuccessfully to resolve the disagreement during a February 8, 2012 meeting, and ultimately created the schedule herself. (D. SOF ¶ 27; P. Resp. to D. SOF ¶ 27.) On February 14, 2012, Coleman e-mailed Weigel and Sue Ferbet, the Regional Vice President of Clinic Operations, describing the scheduling dispute and noting that she found Plaintiff's conduct "unprofessional, disrespectful and inconsiderate." (D. SOF ¶ 27; P. Resp. to D. SOF ¶ 27.) She also noted that "Since [Plaintiff]'s arrival, there have been many concerns which I have tried to address without involving management," but that she could no longer maintain the operations of the clinic without management intervention. (D. SOF ¶ 27; P. Resp. to D. SOF ¶ 27.)

## III. Verbal Warning

In response to these complaints, Weigel traveled to the Lockport store on February 16, 2012 to meet with Plaintiff. Weigel gave Washington a verbal warning—the first step in TCH's Corrective Action Policy—and memorialized the conversation in a February 22, 2012 e-mail message to Washington. (P. SOF ¶ 29; D. SOF ¶ 31; P. Resp. to D. SOF ¶ 31.) As set forth in her e-mail, Weigel reminded Washington that he was expected to participate in patient callbacks, explained the proper way to document patient encounters in the TCH database, and requested that Washington fill out a medication error report for a particular patient. (D. SOF ¶ 31; P. Resp. to D. SOF ¶ 31.) Washington explained during the meeting that when there was a high volume of patients, he was often too busy to do patient callbacks. (*See* D. SOF ¶ 31; P. Resp. to D. SOF ¶ 31.) Weigel made two suggestions to facilitate clinic operations. First, she suggested that Washington delegate the responsibility for ordering supplies to a Medical Assistant in order to ensure consistency and free up his time. (D. SOF ¶ 31; P. Resp. to D. SOF ¶ 31.) Second, she encouraged Washington to "[g]ive positive feedback or a compliment to your clinic

colleagues daily," to "[g]reet the store manager on a daily basis, smile and initiate the conversation," and to greet the pharmacy staff and pharmacy manager daily. (D. SOF ¶ 31; P. Resp. to D. SOF ¶ 31; Weigel E-mail to Washington, Feb. 22, 2012, Ex. 22 to Washington Dep., Ex. A to D. SOF [32-1], hereinafter "Weigel Feb. 22 E-mail.")

According to Plaintiff, Weigel also made suggestions that were not memorialized in the February 22 email: She requested that Washington keep a log of his conversations with co-workers so that Weigel could monitor his progress. (P. SOF ¶ 36.) Plaintiff also maintains that Weigel suggested Washington could foster positive morale if he would "meet with the girls, tell them that their hair is pretty, or that they have nice shoes, or take them to lunch or buy coffee." (P. SOF ¶ 32.) Plaintiff interpreted this suggestion as Weigel's attempt to set Plaintiff up for a sexual harassment charge. (P. SOF ¶ 33.) Weigel denies making these statements. (Supp. Decl. of Anne Weigel, Ex. K to Def.'s Opp. Appendix [44-1] ¶ 9.)

From Washington's perspective, Weigel's complaints were a complete surprise: He had previously complained to Weigel that Watt, the Medical Assistant, was not doing her job, which included making patient callbacks, and did not feel he was to blame for this failure. (P. SOF ¶ 26.) Plaintiff also took offense at Weigel's suggestion that he did not know how to socialize with his employees. (P. SOF ¶ 35.) Washington nevertheless told Weigel that he "appreciated" her suggestions and later testified that all of the requests in her e-mail were reasonable. (D SOF ¶¶ 32, 37; P. Resp. to D. SOF ¶¶ 32, 37.)

Defendant asserts that Washington's performance did not improve after the verbal warning. He did investigate the complaints against him: After the February 16, 2012 meeting, Plaintiff approached his co-workers, including the Walgreens store manager, the assistant store manager, the pharmacy manager, and several clerks asking if they had voiced complaints to Weigel. According to Washington, these employees reported they had no complaints about him. (P. SOF ¶¶ 21–25.) He did not otherwise take action in response to Weigel's concerns. Thus, though Washington had told Weigel he was often too busy to see patients and do callbacks, he

refused to free up time by delegating his supply ordering responsibilities. (D. SOF ¶ 33; P. Resp. to D. SOF ¶ 33.) On February 23, Hernandez, the Walgreens store manager, reached out to her supervisor, Dan Pluth, complaining about Washington. Hernandez told Pluth that Washington was "questioning" a Walgreens nurse "as to who is giving/telling information to his boss about daily business." (D. SOF ¶ 38; P. Resp. to D. SOF ¶ 38.) She also complained that "[h]e wrote [a] prescription for [a] patients [sic] father and not for the actual patient." (D. SOF ¶ 38; P. Resp. to D. SOF ¶ 38.) Hernandez urged Pluth to follow up with Weigel to resolve these issues. (D. SOF ¶ 38; P. Resp. to D. SOF ¶ 38.) The same day, Hernandez contacted Weigel directly to share her complaints about Washington's performance. (D. SOF ¶ 39; P. Resp. to D. SOF ¶ 39.) After their conversation, Hernandez memorialized her concerns in an e-mail to Weigel, noting again the prescription error and Washington's confrontational questioning of the nurse. (D. SOF ¶ 39; P. Resp. to D. SOF ¶ 39.) Hernandez also reported that Washington approached her and said "I was told that I have to tell you that I like your shoes or your hair." (D. SOF ¶ 40; P. Resp. to D. SOF ¶ 40.)

Weigel met with Washington the same day and memorialized their conversation in a February 23, 2012 e-mail:

> Eric,
> This is a follow up email regarding our visit on 2-23-12.
> 1. Fill out medication error form and forward it on as discussed. You need to document in the [patient]'s chart the change in the prescription.
> 2. You will follow the expectations that were outlined on the last email regarding suggestions as ways to improve staff communication and relationship. Please refrain from any negative approach to staff members (I.e., "I was told I have to tell you that I like your shoes or hair). This was not listed on the suggestion list from the previous email.
> 3. I reiterated that everyone is expected to do callbacks when not busy seeing [patients].
> 4. Please talk to Dr. Bruckner regarding his comments on [two patients'] charts
>
> Thanks,
> Anne

(D. SOF ¶ 41; P. Resp. to D. SOF ¶ 41.) Plaintiff understood from this meeting that he was supposed to "stick to the script" in Weigel's February 22, 2012 email; that is, use only the

phrases listed in the February 22, 2012 e-mail and avoid additional negative comments, such as "I was told I have to tell you . . . ."  (D. SOF ¶ 41; P. Resp. to D. SOF ¶ 41.)  Plaintiff also alleges that during the February 16 or February 23 meeting, or both, Weigel told him that if he returned to his position as a Nurse Practitioner, he would not have to fulfil these particular job functions. (P. SOF ¶¶ 29–30, 34.)

IV.    **Washington's First Complaint to Human Resources**

Two days later, on February 25, 2012, Washington e-mailed the centralized Human Resources e-mail, HR Solutions, requesting a "review of policy regarding disciplinary action." (P. SOF ¶ 40; D. SOF ¶ 42; P. Resp. to D. SOF ¶ 42.)   TCH's Harassment and Discrimination policy explains that if an employee has a complaint, the employee should report his or her complaint to his or her "choice of leader of the Human Resources Department."  (D. SOF ¶ 63; P. Resp. to D. SOF ¶ 63.)  In his message to HR Solutions, Washington claimed that he had "been frequently advised to relinquish the position of Clinic Coordinator to Dolphine" and that the complaints about his demeanor "suggest a bias in favor of Dolphine that is not based upon facts or TCHS policy."  (D. SOF ¶ 42; P. Resp. to D. SOF ¶ 42.)

In response to Plaintiff's complaint, on March 1, 2012, Sue Ferbet set up an in-person meeting—the record does not state where—with Plaintiff, Weigel, and Shawna Russo, who held the title of Human Resources Business Partner.  (P. SOF ¶ 41; D. SOF ¶ 43.)  According to Russo's notes from that meeting, Plaintiff made two complaints:  (1) his proposed schedule had not been adopted at the clinic; and (2) he found the logs of social interactions insulting and complained that he did not want to compliment the "girls hair or shoes"; he felt that would require him to "change [his] value system."  (D. SOF ¶¶ 43–48; P. Resp. to D. SOF ¶¶ 43–48.) In response to the scheduling dispute, Ferbet explained that Washington's proposed schedule was not chosen because it included scheduled overtime in violation of TCH policy.  (D. SOF ¶ 44; P. Resp. to D. SOF ¶ 44.)   In response to his second complaint, Russo clarified that Washington was not being asked to change his value system, but was instead being asked to

greet his colleagues when arriving and leaving, "[s]imply acknowledging them." (D. SOF ¶ 46; P. SOF ¶ 46; Mar. 1, 2012, Ex. 27 to Washington Dep., Ex. A to D. SOF [32-1], hereinafter "Mar. 1. Mem." at 2.) Ferbet clarified that "no one is asking for afterhours socializing, just asking Washington to greet colleagues on the way in and out." (D. SOF ¶ 46; P. SOF ¶ 46.) In response to Washington's complaint about the conversation log, Ferbet continued that Weigel "is looking for documentation that you are doing something, it is between you and your manager." (D. SOF ¶ 46; P. SOF ¶ 46; Mar. 1 Mem. at 2.) Though Weigel had requested, in the February 16 meeting, that Washington give positive compliments to his co-workers, the notes of the March 1 meeting show that Ferbet and Russo emphasized the greetings. (Mar. 1 Mem. at 2.) Finally, Washington disputed that his co-workers had complained about his behavior: He stated that the complaints "came out of nowhere" and that he had personally approached Walgreens' employees to ask if they had a problem with him. (D. SOF ¶ 49; P. Resp. to D. SOF ¶ 49.) Washington reported that two employees said they had no problem with him, and a third said he was too busy to speak with Washington. (D. SOF ¶ 49; P. Resp. to D. SOF ¶ 49.) Washington, therefore, concluded that Weigel was manufacturing the complaints. (*See* P. SOF ¶¶ 21–25.)

## V. Written Discipline: Corrective Action Plan

Meanwhile, it is undisputed that Plaintiff's treatment errors continued. Lockport's Collaborating Physician, Dr. Joseph Bruckner, was responsible for overseeing treatment decisions in the clinic during Plaintiff's time at Lockport. (D. SOF ¶ 53; P. Resp. to D. SOF ¶ 53.) In early 2012, Dr. Bruckner informed Weigel that he had verbally warned Plaintiff many times about medication and dosing errors. (D. SOF ¶ 54; P. Resp. to D. SOF ¶ 54; Weigel Decl. Ex. F to D. SOF [32-1], ¶ 10.) On February 27, 2012, as a result of these concerns, Weigel sent

the charts of five patients Washington had treated to the Regional Medical Director,[1] Dr. Scott Sorries. (D. SOF ¶ 54; P. Resp. to D. SOF ¶ 54.) Dr. Sorries promptly reviewed the charts and responded the next day: He noted that Dr. Bruckner had already forwarded some of the same charts to him directly based on Dr. Bruckner's concerns. (Sorries E-mail to Weigel, Feb. 28, 2012, Ex. D to Weigel Decl., Ex. F to D. SOF [32-1], hereinafter "Sorries E-mail.") In Dr. Sorries' view, the five charts Weigel sent "plus other[s] I have seen are concerning about [Washington's] treatment choices." (*Id.*) Though he noted that none of the errors "by themselves are really bad," he concluded that Washington was "not meeting the standard of excellent care that we strive to provide our patients . . . If he continues this way we will have to consider letting him go." (Sorries E-mail; D. SOF ¶ 55; P. Resp. to D. SOF ¶ 55.) Dr. Sorries recommended finding "educational materials . . . that may help remediate" Washington's practices. (Sorries E-mail.) On March 2, 2012, Weigel spoke to Dr. Bruckner about treatment Washington had provided to clinic patients. She summarized that conversation in an e-mail message to Ferbet and Russo two days later:

> Dr. Bruckner stated having concerns regarding [Plaintiff]'s documentation, medication choices and dosages. He is also concerned about the number of charts he has reviewed in the past few months with medication and dosing errors. Dr. Bruckner has talked with [Plaintiff] about this many times, but this continues to be a problem. He stated [Plaintiff] may benefit from a medication review course from Education which may or may not help.

(Weigel E-mail to Russo and Ferbet, Mar. 4, 2012, Ex. E to Weigel Decl. [32-1]; D. SOF ¶ 56; P. Resp. to D. SOF ¶ 56.)

On March 7, 2012, Weigel learned from Stephanie Stubbio—whose job title is not specified in the record, but apparently is responsible for tracking the CP logs—that Plaintiff had not been properly documenting his required meetings with the Collaborating Physicians. (D. SOF ¶ 57; P. Resp. to D. SOF ¶ 57; Weigel E-mail to Russo, Mar. 7, 2012, Ex. F to Weigel

---

[1] The parties do not specify the job responsibilities of the Regional Medical Director, but the court understands that the role is filled by a physician who exercises supervisory and management authority over Clinic Coordinators and Nurse Practitioners.

Decl., Ex. F to D. SOF [32-1].) Clinic Coordinators are required to submit the logs on a monthly basis to Physician Alliances, the department responsible for managing the Collaborating Physicians, but Washington had not submitted any logs since November 2011. (D. SOF ¶ 57; P. Resp. to D. SOF ¶ 57.) Two days later, on March 9, 2012, Hernandez, the Walgreens store manager, relayed another complaint about Washington's treatment choices to Weigel: According to Hernandez, a mother complained that Washington had misdiagnosed her two-year old son as having a double ear infection, when he in fact had a strep throat infection. (D. SOF ¶ 58; P. Resp. to D. SOF ¶ 58.)

In response to the complaints from Walgreens staff and TCH's concerns about Washington's treatment choices, Anne Weigel and Shawna Russo developed a Corrective Action Plan dated March 7, 2012—the second step in TCH's discipline policy—which Sue Ferbet reviewed and approved. (D. SOF ¶ 60; P. Resp. to D. SOF ¶ 60; Washington Corrective Action Plan, Ex. I to Russo Decl., Ex. B to D. SOF [32-1].) A Corrective Action Plan "is used to address unacceptable performance and is issued in conjunction with a written warning and/or a final warning." (D. SOF ¶ 30; P. Resp. to D. SOF ¶ 30; Take Care Health Corrective Action Policy, Ex. A to Russo Decl., Ex. B to D. SOF [32-1], hereinafter "Corrective Action Policy," 1.) Plaintiff's written warning presented several "issues to be addressed," including Plaintiff's rude and confrontational interactions with staff, his refusal to appropriately greet and interact with his colleagues, his lack of communication with the Walgreens' store manager about clinic operations, his failure to send his Collaborating Physician logs to Physicians Alliances since November 2011, his refusal to assist with patient callbacks, and his treatment and medication errors. (D. SOF ¶ 60; P. Resp. to D. SOF ¶ 60.) The Corrective Action Plan included the following "Expected action to be taken by the individual":

1. Submit December 2011, January 2012 and February 2012 [Collaborating Physician] logs to physician alliances
2. Medication Review Course & Post-Test
3. Successful completion of NAPNAP course for pediatric medications.

4. Completion of Essentials of Pediatric Pharmacology: How Children are Different [ . . . ]
5. Completion of Chart Documentation [course . . . ]

   These [courses] should be completed by March 15th, 2012.

6. Meet with Store Manager to schedule regular clinic update meetings
7. Assist with patient callbacks.
8. Be available to pharmacy staff when they need to consult

(D. SOF ¶ 61; P. Resp. to D. SOF ¶ 61). Russo and Weigel presented the Corrective Action Plan to Plaintiff on March 9, 2012, and though he later testified that he thought the action items were reasonable, he refused to sign the document. (D. SOF ¶ 62; P. Resp. to D. SOF ¶ 62.)

## VI. Plaintiff's Second Complaint and Resignation

Plaintiff did not respond to the action plan or complete the training courses. Instead, on March 14, 2012, he submitted another complaint to Human Resources, titled a "Notice of Violation." (P. SOF ¶ 45; D. SOF ¶ 65.) He asserted in the notice that he was being harassed by Weigel on the basis of his race and sex and that he "was strongly admonished that unless he told white women at Lockport that they had 'nice hair and shoes,' he would be punished." (Washington E-mail to HR Solutions, Mar. 14, 2012, Ex. N to P. SOF [34-1], hereinafter "Notice of Violation"; P. SOF ¶ 45; D. SOF ¶ 65.) He further claimed that after his initial complaint to Human Resources on February 25, 2012, "the racially motivated sexual harassment intensified," but does not specify how. (Notice of Violation.) The March 14, 2012 Notice references a previous complaint of harassment, but Washington has admitted that this March 14, 2012 complaint was the first time he mentioned race or sex discrimination to TCH management. (D. SOF ¶ 64; P. Resp. to D. SOF ¶ 64.)

Plaintiff's next scheduled work day after submitting the second complaint was March 22, 2012. Russo called Washington that day and explained that his complaint had been turned over to the Walgreens' Loss Prevention Department for investigation, pursuant to TCH's standard protocol. (D. SOF ¶ 67; P. Resp. to D. SOF ¶ 67.) Two days later, on March 24, 2012, Plaintiff resigned his position at TCHS. In his written Notice of Resignation, Plaintiff explained that:

> [r]ecent occurrences demand that I resign my position with Take Care Health Systems (TCHS) effective April 2, 2012. Specifically, gender and racial discrimination, as well as retaliation has substantially prejudiced my performance and negated my ability to assist in the furthering the goals of TCHS.

(P. SOF ¶ 48; D. SOF ¶ 70; P. Resp. to D. SOF ¶ 70; Notice of Resignation, Ex. O to P. SOF [34-1].)

Plaintiff also testified that on March 25 or 26, after his resignation, Ms. Weigel told him that the next time Dr. Bruckner "complains about you, I will shoot you." (Washington Dep. at 273:13–21; P. SOF ¶ 44; D. SOF ¶ 71; P. Resp. to D. SOF ¶ 71.) Plaintiff admits that he did not report this comment to anyone in TCH management or the police, nor did he include this alleged remark in his affidavit to the EEOC.[2] (D. SOF ¶ 71; P. Resp. to D. SOF ¶ 71.) Plaintiff filed this complaint on October 16, 2013 alleging racial and sexual discrimination, a hostile work environment, constructive discharge and retaliation.

## DISCUSSION

Defendant urges that summary judgment is appropriate because Plaintiff has failed to present evidence showing a hostile work environment, an adverse employment action, or that any of TCH's actions were motivated by Plaintiff's race or sex. Rather, TCH urges that Plaintiff faced legitimate discipline based on repeated complaints from staff and patients. The court will grant a motion for summary judgment when "there is no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court "constru[es] all facts, and draw[s] all reasonable inferences from those facts, in favor of the nonmoving party." *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)). Summary judgment "is the put up or shut

---

[2] The parties have not provided any details regarding Plaintiff's EEOC complaint. The record includes an affidavit submitted to the EEOC, signed and dated May 9, 2012. (EEOC Intake Questionnaire, Ex. 44 to Washington Dep., Ex. A to D. SOF [32-1].) Washington also signed the charge of discrimination he submitted to the Illinois Human Rights Commission on May 9, 2012. (Illinois Human Rights Commission Charge of Discrimination, Ex. 45 to Washington Dep., Ex. A to D. SOF [32-1].)

up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation marks and citation omitted). The moving party has the initial burden to show that the evidence is insufficient to establish a material element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the non-moving party must then "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the evidence supporting the non-moving party's claim is insufficient for a reasonable jury to return a verdict in its favor, the court will grant summary judgment. *Id.* Conclusory allegations of discrimination, therefore, cannot defeat a summary judgment motion. *See Fischer v. Wayne Dalton Corp.*, 139 F.3d 1137, 1140 (7th Cir. 1998).

Washington's complaint raises four[3] claims: Count I, entitled "constructive discharge," asserts that Plaintiff was subjected to a hostile work environment and that he was constructively discharged as a result of intolerable conditions. Counts II and III allege discrimination based on Washington's race and sex. Finally, in Count IV, Washington asserts that he was retaliated against as a result of his March 14, 2012 complaint. As explained below, the record does not support these allegations, and Defendant Take Care Health Services is entitled to summary judgment as a matter of law.

## I.     Count I: Hostile Work Environment and Constructive Discharge

To survive summary judgment, Washington must present evidence that he was harassed because of his race or sex, or in retaliation for protected conduct, and that the harassment was severe or pervasive enough to create an objectively hostile work environment. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). When considering

---

[3]     Washington's complaint included a fifth count alleging violation of the Illinois Human Rights Act. Plaintiff voluntarily dismissed Count V. (12/17/2013 Minute Entry [15].)

whether Washington's work environment was objectively hostile, the court evaluates the totality of the circumstances, including:

> (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim.

*Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014). "The key inquiry is whether the conduct was so severe or pervasive that it altered the conditions of the employment relationship." *Id.* As it has often been said, "Title VII is not . . . a general civility code" and it does not protect employees from normal petty slights, minor annoyances, or routine workplace grievances. *Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Washington's hostile work environment claim fails because he has not provided sufficient evidence for a reasonable juror to conclude that his work environment was objectively hostile or that he was subjected to harassing conduct that was severe or pervasive. Nor has he presented evidence that his employer's conduct was based on membership in a protected class.

Washington urges that his working condition was hostile as a result of the "repeated humiliations Washington endured." (Pl. Mem. of Law in Supp. of Mot. for Summ. J. [37], hereinafter "Pl.'s Mem.," 8.) Washington describes the offending conduct as:

> the demeaning, scripted, conversational gambits he was directed to use, the conversation log he was told to keep, the unrelenting pressure to give up his position coupled with the repeated statements that the harassment would stop if he did so, diminishment of his responsibilities, false statements that other employees at the store disliked him, the continued threats that he would be fired, the failure of Weigel's superiors to respond to Plaintiff's complaints, the direction to make offensive, possibly illegal statements to employees, and eventually the threat to shoot him.

(*Id.*) The court will assume that the atmosphere was subjectively offensive to Plaintiff. The evidence does not establish an environment that was objectively offensive, however. Washington refers to "continued threats that he would be fired," but it is undisputed that he was not fulfilling his job responsibilities, and there is no evidence that these "threats," in the form of

16

verbal and written warnings—nearly all of which were based upon complaints from patients and staff—were motivated by anything other than poor performance. Legitimate discipline is not harassment. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 466 (7th Cir. 2014) ("An employer can micro-manage and require as much petty communication as it wishes. And it may legitimately discipline an employee who fails to conform to the requirement so long as the discipline is not used as pretext for discrimination."); *Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559, 564–65 (7th Cir. 2009) (criticisms, performance evaluations, and psychological evaluations do not amount to a hostile environment). At best Washington's claims are that Weigel (1) made clear to him that she would have preferred that Dolphine Coleman had the Clinic Coordinator role, rather than him; (2) once suggested that he compliment his female co-worker's shoes and hair; and (3) once threatened, after his resignation, to "shoot him" if he made additional mistakes.

These complaints considered alone, or in the aggregate, could not convince a reasonable trier of fact that Washington's work environment was objectively hostile or that the harassment was severe or pervasive. First, Weigel's reminders that Coleman was her first choice for the job, ill-advised and unpleasant as they may have been, do not amount to harassment. Weigel's preference for Coleman appears to have been motivated by Coleman's past incumbency and superior performance, not race or sex: Coleman is African-American, undermining any inference that Weigel's comments were race-based, and the mere fact that Coleman happens to be a woman is insufficient, on its own, to create an inference of discriminatory intent based on sex.

Next, Weigel's suggestion that Washington compliment his co-workers' shoes and hair does not constitute harassment: Washington admits this comment happened only once and that Russo clarified only a few days later that Washington was not required to make these statements, but was only being asked to greet his co-workers. Moreover, without endorsing the wisdom of Weigel's suggestion that Washington compliment his staff, the court concludes such

a suggestion does not constitute harassment. Overtly sexual comments and explicit racial slurs are often insufficient to establish a hostile environment. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (plaintiff's allegation that he was called a "black n---er" while on the severe end of the spectrum, was insufficient to establish a hostile environment.); *Mercer v. Cook Cnty., Ill.*, 527 F. App'x 515, 521 (7th Cir. 2013) ("Sergeant Wright's statement ('those bitches'), Officer's Reed's comment ('oh, bitch'), and Pitts' comment ('go play with yourself') were, in context, the kind of boorish or offensive stray remarks that were 'neither severe or pervasive enough to create an objectively hostile work environment."). Weigel's suggestion that Plaintiff issue compliments to others falls far short of the kind of conduct that would support a hostile work environment claim.

Washington's only allegation that is remotely severe is his assertion that Weigel warned that she would shoot him if Dr. Bruckner complained about him again. This single incident, assuming it occurred, is not sufficient, without more, to create a hostile environment. Washington alleges that Weigel was angry when she made the statement (Washington Dep. at 273:17–19), but a reasonable jury would not believe that Washington subjectively felt threatened: Washington admits that he did not report the alleged threat to anyone at TCH, or to the police, and did not document it as part of his EEOC charge. While a court must view the evidence in the light most favorable to the non-moving party, it is not required to draw unreasonable inferences in the non-movant's favor. *See Tindle v. Pulte Home Corp.*, 607 F.3d 494, 496 (7th Cir. 2010). There is nothing to suggest that Washington actually felt threatened, and a single angry outburst is insufficient to support a hostile environment claim. *See Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005) (verbal outbursts that never became physically threatening are insufficient to create a hostile environment). Nor did Weigel's statement impact Washington's job performance. Indeed, Washington testified that Weigel's threat occurred on March 26, 2012 after he had already submitted his resignation. Finally, even if this comment were sufficiently severe, "the plaintiff must show that the harassment was based on membership

18

in a protected class." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 647 (7th Cir. 2011). The most obvious interpretation of Weigel's statement is that it was based on the number of complaints about Plaintiff that she received from Dr. Bruckner; Washington has nothing to suggest that Weigel's statement was motivated by his race or sex.

Washington's constructive discharge claim must also fail. The Seventh Circuit recognizes two forms of constructive discharge. The first form is based on discriminatory harassment. In those cases, a plaintiff must "show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress." *Chapin v. Fort-Rohr Motors, Inc.,* 621 F.3d 673, 679 (7th Cir. 2010). Because Washington has not established a hostile work environment, he cannot establish constructive discharge based on harassment. "The second form of constructive discharge occurs when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Id.* Washington urges that his resignation constitutes this second form of constructive discharge because Weigel threatened that he would be fired if he did not comply with the Corrective Action Plan. (Pl.'s Mem. at 8.) Proving constructive discharge under this second rubric, however, "does not eliminate the need for the plaintiff to show that his working conditions had become intolerable. And a working condition does not become intolerable or unbearable merely because a prospect of discharge lurks in the background." *Chapin,* 621 F.3d at 679 (internal quotations and citations omitted). Washington's inability to establish a hostile working environment, therefore, also defeats his allegation of a constructive discharge. There is no evidence that his working conditions were hostile, let alone intolerable. And although TCH managers had grave concerns about his performance, there is no evidence that they had concluded, let alone advised Plaintiff, that his termination was inevitable. Defendant is entitled to summary judgment on this claim.

**II.     Counts II and III: Race and Sex Discrimination.**

To survive summary judgment on his race and sex discrimination claims, Washington may proceed on either the direct or indirect method of proof, or both. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). Washington is proceeding under the indirect method. (Pl.'s Mem. at 6.) Under that method, Washington must first make out a prima facie case of discrimination, comprising four elements: (1) Washington is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) at least one similarly situated employee, not in his protected class, was treated more favorably. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). Only after the plaintiff has established a prima facie case does the burden shift to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The plaintiff then has the opportunity to show, by a preponderance of the evidence, that the proffered reason is a pretext. *Id.*

It is undisputed that Washington is a member of a protected class: he is African American and male. Defendant urges that Washington has failed to establish the remaining elements of a prima facie case, however, and the court agrees. Washington cannot show an adverse employment action, because as explained above, he resigned and cannot establish a hostile working environment or constructive discharge. Nor was Washington meeting legitimate employer expectations: the record is replete with undisputed evidence that Washington failed to keep the clinic stocked with needed supplies, failed to make required patient callbacks, did not communicate with Walgreens staff regarding clinic operations, and made repeated errors when treating patients. Finally, Washington has failed to identify any similarly situated comparator. The court addresses these three prongs of the prima facie showing briefly below.

A.    **Adverse Employment Action**

As the Seventh Circuit has explained, there are three general categories of adverse employment actions:

> (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge.

*Alexander,* 739 F.3d at 980 (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011)).  Washington claims fall into the third category, but the verbal and written warnings issued to him do not constitute adverse employment actions because they did not materially change the terms or conditions of his employment.  *See, e.g.*, *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ([W]ritten reprimands without any changes in the terms or conditions of his employment are not adverse employment actions.").  The only material change came when he resigned, but this also does not qualify as an adverse employment action, because as explained above, Washington has not established a hostile working environment or a constructive discharge.

### B.    Legitimate Employer Expectations

Washington asserts that "[f]or the entire time that he worked for TCHS, [he] performed his professional duties in a satisfactory manner" (P. SOF ¶ 46), and that he generally had good relations with his patients.  (P. SOF ¶ 47.)  It is abundantly clear, however, that Washington was not meeting the legitimate expectations of his employer when he resigned.  The record does not confirm that Washington was providing adequate patient care, but assuming that he was, this is insufficient to establish that he was meeting his employer's legitimate expectations; the analysis of that issue "does not merely consider whether a plaintiff's actual job performance was satisfactory—it is a much broader analysis, which allows fact-finders to consider factors such as insubordination and workplace camaraderie."  *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014).  Washington does not dispute that multiple co-workers complained about his demeanor and lack of communication, that Dr. Bruckner and Dr. Sorries raised concerns about his treatment choices, that he refused to make required patient callbacks, that he had trouble keeping the clinic fully stocked with needed supplies, or that he failed to submit the

required Collaborating Physician logs, all of which are job responsibilities of a Clinic Coordinator. Moreover, Washington does not dispute that he refused to sign the Corrective Action Plan or follow his supervisors' instructions to improve his performance when confronted with these errors. There is no serious dispute that Washington was not meeting his employer's legitimate expectations.

### C. Similarly Situated Employee

Finally, Washington has not identified a similarly situated employee. In deciding whether someone is "similarly situated," courts conduct a "flexible, commonsense examination of all relevant factors." *Coleman v. Donahoe,* 667 F.3d 835, 841, 846 (7th Cir. 2012) (citation and internal quotation marks omitted). To be similarly situated, an employee must be "directly comparable to the plaintiff in all material respects." *Id.* at 846 (citation and internal quotation marks omitted). A court's inquiry on this point should not be mechanical, but the case law requires a plaintiff, ordinarily, to show "that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citation and internal quotation marks omitted). Washington has not explicitly identified another employee who served as a Clinic Coordinator, made similar errors, and elicited similar complaints. At best, he has identified Dolphine Coleman, an African-American woman who replaced him as Clinic Coordinator after he resigned. Coleman could only serve as a comparator for his sex-discrimination claim, but even so, Coleman was not similarly situated: it is undisputed that she had successfully served as the Acting Clinic Coordinator before Washington took over the role, and her more favorable treatment is easily explained by her superior performance.

### III. Retaliation

To establish retaliation, Plaintiff must show that he "(1) engaged in a statutorily protected activity; (2) met [his] employer's legitimate expectations; (3) suffered an adverse employment

action; and (4) [was] treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Alexander*, 739 F.3d at 983.  Although Plaintiff's March 14 complaint satisfies the first prong, he has not established any of the remaining elements.

Though the standard for proving an actionable adverse action is less demanding for a retaliation claim than it is for a discrimination claim, *Chaib,* 744 F.3d at 986, Washington still fails to identify any employer conduct that qualifies.  For purposes of a claim of retaliation, adverse action is action that "would cause a reasonable worker to be dissuaded from making or supporting a charge of discrimination."  *Id.* at 986–87.  "Even under th[at] more generous standard . . . , a reprimand without more is not an adverse employment action."  *Id.* at 987 (internal quotations omitted).  More importantly, Washington made his first complaint of discrimination on March 14, 2012 and submitted his resignation ten days later.  None of the conduct that Washington complains of occurred between those two dates.  Washington has therefore failed to show any adverse employment action that would support his retaliation claim. And, as explained above, he has failed to show that he met his employer's legitimate expectations or that a similarly situated employee was treated more favorably.

## CONCLUSION

For these reasons, Plaintiff's motion for summary judgment on Counts I, III, and IV [33] is denied and Defendant's motion for summary judgment [30] is granted.

ENTER:

Date:  March 18, 2015

REBECCA R. PALLMEYER
United States District Judge